# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Sharon D. Robinson,                                    Civ. No. 08-694 (DSD/JJK)

              Plaintiff,

v.
                                                         **REPORT**
Michael J. Astrue, Commissioner of           **AND RECOMMENDATION**
Social Security,

              Defendant.

Fay E. Fishman, Esq., Petersen & Fishman, counsel for Plaintiff.

Lonnie F. Bryan, Esq., Assistant United States Attorney, counsel for Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

       Pursuant to 42 U.S.C. § 405(g), Plaintiff Sharon D. Robinson seeks judicial

review of the final decision of the Commissioner of Social Security

("Commissioner"), who denied Plaintiff's application for disability insurance

benefits.  This matter has been referred to the undersigned United States

Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636

and District of Minnesota Local Rule 72.1.  The parties have filed cross-motions

for summary judgment (Doc. Nos. 14, 16).  For the reasons set forth below, this

Court recommends that Plaintiff's motion be granted, that Defendant's motion be

denied, and that this case be remanded to the Commissioner for a calculation

and award of benefits.

## I.    BACKGROUND

### A.    Procedural History

Plaintiff protectively filed for disability insurance benefits on August 10, 2001, alleging a disability onset date of March 2, 2001.  (Tr. 144.)  The application was denied initially and on reconsideration.  (Tr. 106-08, 111-14.)  Plaintiff timely requested a hearing, which was held before an Administrative Law Judge ("ALJ") on March 19, 2004.  (Tr. 31-103.)  The ALJ issued an unfavorable decision.  (Tr. 949-64.)  Plaintiff sought review of the ALJ's decision by the Appeals Council, but the Appeals Council denied the request for review.  (Tr. 9-11, 13-14.)  The ALJ's decision therefore became the final decision of the Commissioner.  *See* 42 U.S.C. § 405(g); *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).  On March 17, 2005,Plaintiff appealed to the United States District Court for the District of Minnesota.

United States Magistrate Judge Arthur J. Boylan issued a Report and Recommendation (Tr. 1060-88), which was adopted by United States District Judge James R. Rosenbaum on March 7, 2006.  (Tr. 1089.)  The case was remanded, primarily because Dr. Annaphura Bhat's records regarding Plaintiff's treatment history were unreadable, making it impossible to assess Dr. Bhat's opinion of Plaintiff's residual functional capacity.  (Tr. 1084.)  The Commissioner was instructed to "take appropriate steps to ensure that the record includes sufficient medical information to accurately assess the true nature and extent of all of [Plaintiff's] exertional and non-exertional limitations."  (Tr. 1087.)

On remand, a second hearing was held before an ALJ on June 7, 2007. (Tr. 2044-66.)  Prior to that hearing, Plaintiff filed a new application for disability insurance benefits, which was initially denied on April 6, 2006.  (Tr. 932.)  The denial of this application is not before this Court for review.  However, the ALJ, in the decision that is before this Court, noted that significant additional medical information was obtained in connection with the new application.  The ALJ concluded that this information provided sufficient evidence to accurately assess the true nature and extent of Plaintiff's exertional and non-exertional impairments.  (Tr. 932-33.)  Again, the ALJ issued an unfavorable decision.  (Tr. 929-46.)  The Appeals Council denied review, and the ALJ's decision became the final decision of the Commissioner.  (Tr. 921-23.)  Plaintiff filed her present Complaint on March 14, 2008.  (Doc. No. 1.)

### B.    Background

Plaintiff was forty-five years old on her date last insured, March 31, 2006. (Tr. 935, 944.)  She has work experience as an office manager at a beauty salon, as a clerk in the Army, as a cashier and other work in retail sales, and as a cleaning services provider.  (Tr. 172.)  She last worked as an office manager at a beauty salon from October 1999 through March 2001.  (Tr. 172.)  She lives with her husband and two of her three children.  (Tr. 2051.)  Plaintiff testified that on a typical day, she has a whole body ache.  She also experiences consistent pain in two fingers on her right hand, in her lower back, and in her knees.  (Tr. 2052.)

3

Plaintiff further testified that she has persistent headaches, and that she has good days and bad days.  (Tr. 2054-55.)

### C.    Medical Evidence

Dr. Bhat completed a Medical Assessment of Ability to Do Work-Related Activities (Physical) for Plaintiff in the year 2000.  (Tr. 425-30.)  Dr. Bhat recommended several restrictions on Plaintiff's physical exertion in work-related activities, including: (1) she should not lift or carry any weight; (2) she should limit standing or walking to a total of 30 minutes in an eight-hour work day; (3) she should not sit for more than one hour in an eight-hour work day and (4) she should never climb, balance, stoop, crouch, kneel or crawl.  (Tr. 425-26).  Dr. Bhat also concluded that Plaintiff would need to be able to alternate from sitting to standing at will and be permitted lie down at will during the day due to pain or fatigue.  Plaintiff would also need to elevate her leg during the day, would need unscheduled breaks from work three times per day, and her impairments would cause her to be absent from work more than four times per month.  (Tr. 427.)

Most of Dr. Bhat's treatment records are handwritten and illegible.  After the case was remanded, the ALJ attempted to obtain legible copies of these records, or a detailed statement from Dr. Bhat explaining the basis of her opinion of Plaintiff's disability.  Dr. Bhat responded with two letters.  One letter explained that Dr. Bhat treated Plaintiff "in rheumatology care for [systemic lupus erythematosus], Sjogren syndrome and fibromyalgia from 2000 to 2003." (Tr. 1526.)  Dr. Bhat described her clinical findings related to Plaintiff as

4

tenderness of the peripheral joints with swelling, and fibrocystic tender points.
(*Id.*)  Dr. Bhat stated that she treated Plaintiff with Plaquenil, Methotrexate,
Methylprednisone, and multiple muscle relaxants.  (*Id.*)

The second letter submitted by Dr. Bhat contained more detailed
information.  Dr. Bhat noted that she conducted a rheumatology evaluation of
Plaintiff in April 2000, to address Plaintiff's chronic polyarthralgia, a ten-year
period of myalgia, leucopenia, and a positive antinuclear antibodies ("ANA") test.
(Tr. 2043.)  Dr. Bhat diagnosed Plaintiff with lupus, Sjogren's syndrome, and
inflammatory arthritis, superimposed on fibromyalgia symptoms.  (*Id.*)  Dr. Bhat
also recounted that Plaintiff had typical tender points in her para-cervical and
para-lumbar regions, and that Plaintiff showed tenderness and swelling of the
bilateral extremities.  (*Id.*)  Dr. Bhat recounted that her review of Plaintiff's
systems indicated that Plaintiff was positive for malar rash, sleep disturbance,
excessive fatigue, and numbness in the fingers.  (*Id.*)  Finally, Dr. Bhat noted that
lab work from April 11, 2000, revealed Planitiff's elevated erythrocyte
sedimentation rate ("ESR"), elevated ANA, and an antibody consistent with
diagnoses of Sjorgen's syndrome and lupus.  (*Id.*)

Dr. Bhat noted that she treated Plaintiff from April 2000 through March 6,
2003, for an "acute immune condition."  (*Id.*)  Dr. Bhat also wrote that she had
treated Plaintiff with multiple narcotic pain medications, muscle relaxers, and
antidepressant medications.  (*Id.*)  Dr. Bhat noted that Plaintiff suffered from

5

"Pleuresy pain[,] continued active joint pain, swelling and myalgia and persistent elevated ESR." (*Id.*)

Dr. Christian Ohagwu conducted a consultative examination of Plaintiff in November 2001.  (Tr. 270-74.)  Plaintiff reported that her lupus had been active since the diagnosis was first made in 1992, without any known periods of remissions.  (Tr. 270.)  Dr. Ohagwu noted joint involvement with Plaintiff's lupus disease process, arthritis, "ocular involvement" affecting Plaintiff's "visual acuity," and Sjogren's disease.  (*Id.*)  Plaintiff's joint pain was most pronounced in her knees, shoulders, and hands.  Such pain would last for weeks at a time.  (*Id.*)  Plaintiff reported that her medications did nothing to alleviate her pain.  (*Id.*)  Plaintiff also reported being diagnosed with fibromyalgia while in the Army, and that her symptoms did not respond to medication.  (*Id.*)  Plaintiff reported recurrent headaches with blurring of vision and nose bleeds.  (Tr. 271.)  Plaintiff experienced shortness of breath with minimal activity, recurrent nausea and diarrhea, stress-related urinary incontinence, and occasional dizziness.  (*Id.*)  Plaintiff told Dr. Ohagwu that she was markedly limited in her ability to perform household chores.  (Tr. 271.)

On examination, Dr. Ohagwu did not find evidence of deformity or destruction of any of the joints implicated in lupus.  Dr. Ohagwu noted that Plaintiff's knee, shoulder, and hand joints were not swollen, red, or significantly limited in their functions.  (Tr. 273.)  Dr. Ohagwu did not find anything indicative of active Sjorgen's disease.  (*Id.*)  Dr. Ohagwu noted that dryness of the eyes

6

caused by Sjogren's disease was not particularly limiting in terms of employment. (Tr. 273-74.)  Dr. Ohagwu wrote, "If [Plaintiff's] duties are structured to allow her enough sitting time and limit lifting as well as very repetitive use of her extremities, she can still function for several hours in a usual 8-hour work shift." (Tr. 274.)

Plaintiff also underwent a consultative mental health examination, which was conducted by Dr. Steven Snook in April 2002.  (Tr. 317-19.)  Plaintiff reported that she had never received any mental health treatment.  (Tr. 317.) She described herself as somewhat depressed over her various illnesses. (Tr. 318.)  Dr. Snook diagnosed depressive disorder, and assigned Plaintiff a global assessment of functioning ("GAF") score of 50, which indicates moderate difficulty in social, occupational, or school functioning.  (*See id.*)  He also concluded that Plaintiff "may have some difficulty . . . dealing with the general public or supervisors due to her constant pain.  This may also negatively affect her capacity to meet appropriate production norms."  (*Id.*)

In October 2002, Plaintiff was declared 100% disabled by the Veteran's Administration ("VA") as of August 16, 2001.  (Tr. 493-96.)  In its decision, the VA noted that Dr. Bhat had concluded that Plaintiff had frequent flare-ups and could not do any type of work.  (Tr. 494.)  The VA also relied on the findings of Dr. Elam-Kootil which suggested Plaintiff suffered from Cushing's disease due to previous treatment with steroids, her obesity, decreased power in Plaintiff's proximal muscles of the upper and lower extremities, and "classic symptoms of

7

steroid-induced complications." (*Id.*)  The VA stated that it grants 100% disability "whenever there is acute disease with frequent exacerbations producing severe impairment of health." (*Id.*)

Plaintiff established care at the VA hospital in Minneapolis in July 2003. (Tr. 638.)  On her first visit, Plaintiff requested multiple referrals to specialists. (Tr. 638.)  In July and August 2003, Plaintiff was treated at the VA for headaches, thrush like symptoms, abdominal pain, body pain, back pain, and deteriorating vision, as well as other health problems.  (Tr. 660-62, 699, 709-10, 1744-45.)

Plaintiff was evaluated for headaches and chronic pain by neurologist Rajiv Aggarwal in September 2003.  (Tr. 447-49.)  Plaintiff reported having a history of migraines since she was 17 years old.  She also stated that she was suffering from headaches four or five days a week at that time.  (Tr. 447.)  Plaintiff also complained of depression, fatigue, lightheadedness, and imbalance.  (Tr. 448.)  Dr. Aggarwal noted Plaintiff to be on a long list of medications including Singulair, Proventil, Advair, Astelin, Zyrtec, Prevacid, Avalide, Medrol, Glucotrol, Zaroxolyn, Oramorph SR, Ambien, Levsin, and Effexor.  (Tr. 447.)  He also concluded that Plaintiff's neurological, cranial nerve, motor, sensory, and coordination examinations were normal.  (Tr. 448-49.)  Dr. Aggarwal stated that Plaintiff had "features of common migraines," and was using "long-acting narcotics, which she [did] not respond to at times."  (Tr. 449.)  He recommended treatment with the medications Depakote and Relpax.  Noting that Plaintiff had features of chronic

8

pain disorder and fibromyalgia, Dr. Aggarwal recommended follow-up with rheumatology and a chronic pain treatment program.  (*Id.*)

In the following months, Plaintiff continued to be evaluated and treated for a variety of symptoms including numbness and tingling in her left hand (Tr. 445-46); muscle spasms in her neck (722-23); swelling in her legs and feet (Tr. 731-32, 737, 747); and oral thrush, and tenderness in her muscles and joints (Tr. 746-48.)  An MRI of Plaintiff's lumbar spine showed early degenerative arthrosis with mild bulging at her L5-S1 disk.  (Tr. 1762-63.)  In September 2003, Planitiff was evaluated for numbness and tingling in her left hand and several of the fingers of her left hand.  (Tr. 715.)  At that time, Plaintiff had not yet been to a rheumatologist or a pain clinic, but had apparently scheduled an appointment with a rheumatologist for October 1, 2003.  (*Id.*)

During a consultation with Dr. Krishna Pallegar in November 2003, Plaintiff's daughter stated that Plaintiff was constantly sleepy, and that Plaintiff "dozed off while eating, talking, or walking."  (Tr. 763.)  At the time, Plaintiff was taking Valium, Ambien, Flexeril, MS Contin, Percocet, and chronic steroids for arthritis.  (*Id.*)  Dr. Pallegar recommended that Plaintiff taper off the steroid medication, discontinue her use of Valium and Ambien, decrease her dosage of Flexeril, and see a rheumatologist.  (Tr. 765.)

Also in November 2003, Plaintiff saw Dr. Kathy R. Gromer, who concluded that Plaintiff's medications may have caused the severity of her sleeping issues. (Tr. 440-41.)  Dr. Gromer recommended that Plaintiff taper off as many

9

medications as possible and seek treatment at a pain clinic.  (*Id.*)  Dr. Gromer

also concluded that Plaintiff needed to undergo a sleep study (Tr. 441), in which

Plaintiff participated later that month.  The sleep study revealed that Plaintiff

suffered from sleep apnea.  (Tr. 435-39.)

 In January and February 2004, Plaintiff was treated several times in an

emergency room for abdominal pain, nausea, weakness, and headaches.

(Tr. 895-99, 1730-31.)  Following one of these visits, Dr. Pallegar recommended

that Plaintiff discontinue some of her medications and see a rheumatologist.

(Tr. 1731.)

 In March 2004, Plaintiff again went to the emergency room, where she was

seen by Dr. Michael Rock for a four-day headache.  (Tr. 892-95.)  Dr. Rock noted

Plaintiff had been to the emergency room four days earlier with abdominal pain,

and a full battery of lab tests performed on that visit came back normal.  (Tr.

892.)  Dr. Rock concluded that Plaintiff "clearly has chronic pain syndrome."  (*Id.*)

Dr. Rock noted that Plaintiff appeared to be having an anxiety or panic attack

when she arrived.  (*Id.*)  She was writhing on the hospital bed complaining of

head pain and whole body pain.  (*Id.*)  However, she was easily calmed with

reassurance.  (*Id.*)  Dr. Rock also noted:

> She is rocking and moaning on the cart.  At times she will give a
> history and as soon as she is done talking she then starts moaning
> and complaining of her pain again.  She seems to have pain when
> she is not fixating on conversation.  Also at one point after
> pharmocologic therapy I went and woke the patient up from a sound
> sleep and she noted that her headache was then 8 out of 10.  I
> asked her how can you have a headache when you are sleeping so

> comfortably and she said, "I have the headache when I wake up."
> She is hyperventilating and appears to be in the midst of a panic
> attack as well.

(Tr. 893.)  She was treated with anxiety and narcotic pain medication, which Dr.

Rock noted was not the appropriate treatment method to address her chronic

pain.  (Tr. 894.)

Plaintiff began treatment at a pain center in March 2004.  (Tr. 900-12.)

The clinical nurse practitioner reporting on Plaintiff's condition diagnosed Plaintiff

with myofascial pain, fibromyalgia, and chronic sinus infections.  (Tr. 907.)

The pain clinic also performed a psychological evaluation of Plaintiff.

(Tr. 909-12.)  According to Dr. Georgia Panopoulos's report, Plaintiff exhibited

signs of depression and anxiety.  (Tr. 911.)  Dr. Panopoulos noted that Plaintiff

appeared sedated and that Plaintiff's mood was depressed.  (Tr. 911.)  Plaintiff

was diagnosed with pain disorder associated with psychological features and a

GAF score of 40-45, indicating serious difficulty in social, occupational, or school

functioning.  (*See* Tr. 912.)

In April 2004, an MRI of Plaintiff's shoulder indicated mild bursitis and

possible early degeneration of the joint.  (Tr. 1972.)  In May 2004, Plaintiff was

admitted to the Fairview University Medical Center emergency room with chest

pain.  (Tr. 1889-1898.)  Plaintiff had with her a list of 25 medications she was

taking at the time, 33 separate ailments, 14 allergies, and 19 past surgeries.

(Tr. 1891.)  During a stress test, she had anxiety-produced pseudoseizures.

(Tr. 1897.)  Noting the complexity of Plaintiff's patient history, Dr. Charles

11

Moldow questioned whether there was a component to her illnesses of malingering or Munchausen's, because her history, work-up, and medications did not coincide with what was observed on examination.  (Tr. 1896.)

In July 2004, Plaintiff went for a follow-up examination at the pain clinic she first attended in March 2004.  (Tr. 1880.)  She informed the clinical nurse practitioner who had previously seen her that she wanted to discontinue many of her medications.  (*Id.*)  The nurse concluded that Plaintiff's primary problems were chronic pain syndrome with fibromyalgia and abdominal pain.  (Tr. 1882.)

In August 2004, Plaintiff had sinus surgery to treat congestion and persistent epistaxis, or nose bleeds.  (Tr. 1950-52.)  In September 2004, Plaintiff was evaluated for a number of ailments including sinus infection, depression, diarrhea, and osteoporosis.  (Tr. 1721-22.)  Dr. Pallegar adjusted Plaintiff's dosage of anti-depressant medication at that time.  (Tr. 1722.)

Plaintiff was treated in the emergency room on multiple occasions in October 2004, for back pain, chest pain, hip pain, and sinus infection.  (Tr. 1719-21. 1935-36, 1947-49.)

In February 2005, Plaintiff underwent a rheumatology evaluation with Dr. Minenko.  (Tr. 1876-78.)  Dr. Minenko found that Plaintiff suffered from eye and mouth dryness, fibromyalgia tenderness, and hip pain with limited motion. (Tr. 1877.)

In May 2005, Plaintiff saw Dr. Gromer to follow up on a preivous diagnosis of sleep apnea.  (Tr. 1901-02.)  Dr. Gromer reported that many of Plaintiff's

sleeping problems had been related to the drugs she was taking and sleep-disordered breathing.  (Tr. 1902.)  Dr. Gromer observed "striking" improvement in Plaintff's daytime sleepiness.  (*Id.*)  Dr. Gromer agreed to prescribe Lunesta to help Plaintiff stay asleep at night.  She also instructed Plaintiff to continue using a respoiratory ventilating machine at night to treat her "very severe obstructive sleep apnea."  (Tr. 1901.)

In August 2005, Plaintiff was evaluated at the Minnesota Heart Clinic. (Tr. 1920.)  Dr. Elizabeth Bisinov noted that she had seen Plaintiff in the past and discovered that Plaintiff's "coronary arteries were entirely normal."  (Tr. 1920.) Dr. Bisinov found that Plaintiff's symptoms correlated with premature ventricular complexes, which Dr. Bisinov suspected to be the cause of Plaintiff's chest pain. (Tr. 1920, 1923.)  Plaintiff was then treated for many symptoms over the next two months, including joint pain, whole body pain, depression, oral thrush, headaches, and arthritis.  (Tr. 1992, 1997-98, 2001, 2003, 2006-08, 2012-13, 2015-18.)

In December 2005, Plaintiff was diagnosed with major depression. (Tr. 1645.)  Plaintiff felt that "her medical condition initiated most of her down mood."  (*Id.*)  She reported that she had not been sleeping well since her medication was changed from Lunesta to Temazepam.  She was diagnosed with a GAF score of 60, indicating moderate difficulty in social, occupational, or school functioning.  (*See id.*)

13

In January 2006, Dr. Stanley Mintz performed a mental status examination of Plaintiff.  (Tr. 1289-90.)  Dr. Mintz diagnosed Plaintiff with "Adjustment Disorder with Depressed Mood."  (Tr. 1290.)  He also assigned Plaintiff a GAF score of 60.  (*Id.*)

Also in January 2006, was treated for a possible lupus flare.  (Tr. 1638-41.) She had a positive ANA test, and was waiting for further lab work.  (Tr. 1493.)  In April 2006, Plaintiff was treated for body pain.  (Tr. 1544.)  And in June 2006, she continued to have muscle pain (Tr. 1534), which was treated with narcotic pain medications including morphine.  (Tr. 1349.)

Plaintiff saw a rheumatologist in March 2007, and lab work was done to confirm her earlier diagnoses of lupus.  (Tr. 1788-95.)  In an addendum to an earlier treatment record from March 2007, Dr. Hollis Krug questioned the lupus diagnosis due to a negative ANA test and lack of diagnostic criteria.  (Tr. 1793.)

### D.    Expert Testimony

At the hearing before the ALJ, Dr. Jared Frazin appeared and testified as a medical expert.  (Tr. 2055-59.)  Dr. Frazin testified that Plaintiff's residual functional capacity ("RFC") would fall in the category of sedentary work, permitting her to occasionally climb stairs, but not ladders or scaffolding.  Such an RFC would permit Plaintiff to engage in occasional balancing, stooping, kneeling and crouching, but no crawling.  Plaintiff could reach overhead occasionally.  She could engage in simple grasping, but not "power grasping." The RFC required Plaintiff to avoid extreme cold and vibration, as well as all

14

fumes, odors, dusts, gasses, and poor ventilation. The RFC did not rule out Plaintiff's employment in office, retail, or clean manufacturing environments. (Tr. 2058.)

Dr. Frazin testified that Plaintiff would have difficulty maintaining acceptable attendance at work. (Tr. 2059.) He specifically agreed with the testimony of the medical expert at Plaintiff's first hearing, that based on the record, Plaintiff would have trouble missing fewer than two days each month. (Tr. 2059.) The medical expert at the prior hearing, Dr. LaBree, had also previously testified that Plaintiff's chronic back pain would "interfere with her ability to be at work five days a week, eight hours a day and sustained work activities." (Tr. 1047.) When asked whether he would agree with Dr. LaBree's opinion that Plaintiff would have "difficulty maintaining [work activities for] eight hours in a day[,]" Dr. Frazin responded that he would agree with that assessment as well. (Tr. 2059.)

Kenneth E. Ogren testified as a vocational expert ("VE") at the hearing. (Tr. 2059-65.) In response to a hypothetical question, the VE testified that a person of Plaintiff's age, education, and work experience, who had the impairments and limitations described by Dr. Frazin, could perform her past relevant work as an office manager, and as a clerk. (Tr. 2060-61.)

The ALJ posed a second hypothetical question, adding an at-will sit/stand restriction. The VE testified that this would not change his testimony. (Tr. 2061.) The VE also testified that adding restrictions on climbing and balancing would not

change his testimony. (Tr. 2061-62.) When the ALJ added restrictions for routine, repetitive, three-to-four-step tasks, the VE testified that such a person could not perform Plaintiff's past work. (Tr. 2062.) However, the VE testified that such a person could perform other jobs available in the national economy such as inspector, polisher, and assembler. (*Id.*) The VE testified that if the ALJ further restricted such a person to no more than brief superficial contacts with others, it would not change his testimony as to those jobs. (*Id.*)

The VE explained that there is now a great variation in acceptable absenteeism from work. (Tr. 2062-63.) However, in general, calling in sick one day per month would be considered acceptable according to the VE's testimony. (Tr. 2063.) The VE testified that the inability to maintain production standards, the need to lay down at will during the day, having difficulty concentrating that would impact one's work, and the need for unscheduled breaks during the day would each eliminate competitive employment. (Tr. 2064-65.)

### E.    The ALJ's Decision

In finding that Plaintiff was not disabled, the ALJ employed the required five-step evaluation. *See* 20 C.F.R. § 404.1520(a)-(f). At the first step of the evaluation, the ALJ found that Plaintiff had not engaged in substantial gainful activity since March 2, 2001, through her date last insured of March 31, 2006. (Tr. 935.) At the second step of the evaluation, the ALJ found that Plaintiff had severe impairments of:

> an autoimmune disease encompassing diagnoses of systemic lupus,
> a mixed connective tissue disorder, Sjogren's and/or rheumatoid
> arthritis, degenerative joint disease v. lupus; fibromyalgia; mild
> degenerative disc disease of the lumbar spine; sarcoidosis;
> pulmonary disease or asthma with a history of tobacco abuse;
> diabetes mellitus; obstructive sleep apnea; obesity; and headaches.

(*Id.*)  At the third step of the evaluation, the ALJ determined that Plaintiff did not have an impairment or impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 937.)

At step four of the evaluation, the ALJ found Plaintiff to have the following residual functional capacity: (1) she could occasionally climb stairs, balance, stoop, kneel, and crouch; (2) she could never crawl; (3) she could occasionally reach overhead, but she should not perform any "power gripping"; (4) she could engage in simple grasping—meaning she could hold objects with a grip-strength of up to 30 pounds; (5) she should avoid moderate exposures to cold, vibration, fumes, odors, dust, gases and poor ventilation, but work in a retail environment or clean office would be possible if it involved routine, repetitive, and three-to-four-step tasks.  (Tr. 937.)  The ALJ concluded that Plaintiff was unable to perform her past relevant work.  (Tr. 944.)

At the fifth step of the evaluation process, the ALJ determined that the Medical Vocational Rules supported a finding that Plaintiff was not disabled. (Tr. 945.)  The ALJ relied on the VE's testimony that a person with Plaintiff's age, education, work experience, and residual functional capacity could perform jobs that exist in significant numbers in the national economy such as inspector,

polisher, and assembler.  (Tr. 945.)  Thus, the ALJ determined that Plaintiff was

not disabled within the meaning of the Social Security Act.  (*Id.*)

## II.    STANDARD OF REVIEW

Congress has prescribed the standards by which Social Security disability

benefits may be awarded.  "Disability" under the Social Security Act is the

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment."  42 U.S.C. § 423(d)(1)(A).  "An

individual shall be determined to be under a disability only if his physical or

mental impairment or impairments are of such severity that he is not only unable

to do his previous work but cannot, considering his age, education, and work

experience, engage in any other kind of substantial gainful work which exists in

the national economy."  42 U.S.C. § 423(d)(2)(A).

Review by this Court is limited to a determination of whether the decision

of the Commissioner is supported by substantial evidence on the record as a

whole.  42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006).

"There is a notable difference between 'substantial evidence' and 'substantial

evidence on the record as a whole.'"  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th

Cir. 1987).  Substantial evidence is "more than a mere scintilla.  It means such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotations

omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001)

("Substantial evidence is less than a preponderance, but enough that a

18

reasonable mind might accept it as adequate to support a decision.").

"'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing

analysis." *Gavin*, 811 F.2d at 1199.  "The substantial evidence test employed in

reviewing administrative findings is more than a mere search of the record for

evidence supporting the [Commissioner's] findings." *Id.*  In reviewing the

administrative decision, "'[t]he substantiality of evidence must take into account

whatever in the record fairly detracts from its weight.'" *Id.* (citing *Universal

Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

     In reviewing the record for substantial evidence, the Court may not

substitute its own opinion for that of the ALJ.  *Woolf v. Shalala*, 3 F.3d 1210,

1213 (8th Cir. 1993).  The Court may not reverse the Commissioner's decision

merely because evidence may exist to support the opposite conclusion.  *Mitchell

v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213

(concluding that the ALJ's determination must be affirmed, even if substantial

evidence would support the opposite finding).  Instead, the Court must consider

"the weight of the evidence in the record and apply a balancing test to evidence

which is contradictory." *Gavin*, 811 F.2d at 1199.  The possibility that the Court

could draw two inconsistent conclusions from the same record does not prevent

a particular finding from being supported by substantial evidence.  *Culbertson v.

Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

     The claimant bears the burden of proving his or her entitlement to disability

insurance benefits and supplemental security income under the Social Security

19

Act.  *See* 20 C.F.R. §§ 404.1512(a), 416.912(a); *Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated that he or she cannot perform past work due to a disability, "the burden of proof shifts to the Commissioner to prove, first that the claimant retains the residual functional capacity to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to do."  *Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

## III.   DISCUSSION

### A.   Whether the ALJ Complied with the Remand Order

Plaintiff first argues that the ALJ failed to follow the Court's remand order. As discussed above, the Court's previous remand order instructed the ALJ to take the steps necessary to ensure that the record included sufficient medical information to accurately assess the nature and extent of Plaintiff's limitations. (Tr. 1086.)  The ALJ made an effort to obtain legible copies of Dr. Bhat's treatment records.  Dr. Bhat was unable to produce these records, but instead wrote two letters describing her treatment of Plaintiff.  The first letter provided little information.  The second letter sufficiently described Dr. Bhat's evaluation, diagnoses, and treatment of Plaintiff.  (Tr. 2043.)  The ALJ was not required to seek additional medical evidence because Dr. Bhat's second letter adequately addressed the Court's concern with the record prompting the earlier remand order.

20

**B.     Whether the ALJ's Residual Functional Capacity Determination Is Supported By Substantial Evidence.**

Plaintiff also argues that the ALJ erred in reaching the RFC determination for several reasons.  First, she argues that the ALJ failed to give appropriate weight to the opinions of treating and examining physicians and improperly rejected medical evidence regarding Plaintiff's potential absenteeism.

**1.     Whether the ALJ appropriately weighed the opinions of Dr. Bhat.**

A treating physician's opinion is typically entitled to controlling weight if it is "'well-supported by medically acceptable clinical and laboratory and diagnostic techniques and is not inconsistent with other substantial evidence in [the] record.'"  *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007) (quoting *Prosch v. Apfel*, 201 F.3d 1010, 1012-13 (8th Cir. 2000)) (alteration in original).  If a treating source's opinion is not given controlling weight, the ALJ must consider other factors to determine the weight it should be given.  20 C.F.R. § 404.1527(d)(2).  These factors include the length of the treatment relationship, the nature and extent of the treatment relationship, the degree to which the medical source supports the opinion, the consistency of the opinion with the record as a whole, the specialization of the source in the area addressed by the opinion, and other factors deemed to support the opinion.  20 C.F.R. § 404.1527(d)(2)(i)-(ii), (d)(3)-(6).

Plaintiff contends that the ALJ improperly rejected the "Medical Assessment of Ability to do Work-Related Activities (Physical)" provided by Dr.

Bhat.  (*See* Tr. 425-30.)  The ALJ gave no weight to this undated medical opinion

for the following reasons: (1) it was not supported by objective evidence; (2) it

was inconsistent with Plaintiff's own allegations; (3) its imposition of restrictions

were inconsistent with the other medical opinions in the record; and (4) the

support provided in the clarification of the opinion by Dr. Bhat's June 2007 letter

was inconsistent with the other medical evidence.  The ALJ also indicated that it

appeared Dr. Bhat had reached her conclusions for the purpose of helping

Plaintiff secure VA benefits.

In her June 2007 letter, Dr. Bhat provided clarification of her assessment of

Plaintiff's ability to do work-related activities.  Dr. Bhat's letter explains that she

based her restrictions on Plaintiff's work-related activities on tenderness and

swelling observed in Plaintiff's joints, sleep disturbances, and excessive fatigue,

among other symptoms.  Dr. Bhat also addressed Plaintiff's diagnoses of lupus,

Sjorgen's syndrome, inflammatory arthritis, and fibromyalgia as support for her

restrictions.

For several reasons, the ALJ erred in granting no weight to Dr. Bhat's

assessment and her explanations.  First, while Dr. Bhat's opinions were used by

the VA in determining that Plaintiff was entitled to VA disability benefits, there is

no support in the record for the ALJ's inference that Dr. Bhat's assessment was

compromised by an improper motive.

Second, the ALJ's decision to give no weight to Dr. Bhat's findings that

Plaintiff suffered swelling and joint pain based on the lack of swelling and other

22

symptoms noted in later medical records fails to take into account the cyclical nature of Plaintiff's lupus diagnosis.  *See Gude v. Sullivan*, 956 F.2d 791, 794 (8th Cir. 1992) (noting that "[t]he course of SLE is chronic and relapsing with long periods of remission and is totally unpredictable").  Plaintiff continued to seek treatment for pain throughout her disability period and was treated with multiple strong medications.  Such a medical history does not support the ALJ's outright rejection of Dr. Bhat's opinion.

Third, several of the factors the ALJ was required to consider pursuant to 20 C.F.R. § 404.1527(d), support granting greater weight to Dr. Bhat's assessment, including the length of her treatment relationship with Plaintiff, *id.* § 404.1527(d)(2)(i), and Dr. Bhat's specialization as a rheumatologist, *id.* § 404.1527(d)(5).  Fibromyalgia and lupus, for instance, fall under the medical specialty of rheumatology, and Dr. Bhat diagnosed Plaintiff with both of these impairments.  *See Brosnahan v. Barnhart*, 336 F.3d 671, 672 n.1 (8th Cir. 2003).  The ALJ's conclusion that "[t]he degree of Dr. Bhat's restriction is inconsistent with all the other medical opinions of record" ignores Dr. Bhat's specialization as a rheumatologist.  That specialization entitles her opinion to more weight than the opinions of other non-specialists because Dr. Bhat's diagnoses of lupus and fibromyalgia were confirmed by clinical findings such as multiple positive ANA tests and the presence of tender points typical of those impairments.  *See Kelley v. Callahan*, 133 F.3d 583, 589 (8th Cir. 1998) (noting that a treating specialist's

23

opinion is entitled to greater weight than the opinions of non-specialists where the specialist's opinion is supported by clinical data).

Thus, the ALJ's decision to grant "no weight" to Dr. Bhat's assessment and the limitations she would impose on Plaintiff's work-related activities was not supported by substantial evidence.  Contrary to the ALJ's conclusion, Dr. Bhat's diagnoses of lupus and fibromyalgia were well supported.  There was no indication in the record that Dr. Bhat used  medically unacceptable clinical or diagnostic techniques.  Dr. Bhat's opinions regarding Plaintiff's absenteeism and inability to do work-related activities on a full-time, eight-hour basis for five days a week, while more restrictive than other opinions in the record, are not inconsistent with the record as a whole.  *See* 20 C.F.R. § 404.1527(d)(4).  This Court need not ultimately determine that the ALJ should have given Dr. Bhat's assessment controlling weight; it is sufficient to note that, according to the criteria for evaluating a treating source's opinion under 20 C.F.R. § 404.1527(d), Dr. Bhat's assessment was entitled to substantial weight.  The ALJ, therefore, erred in rejecting that opinion outright.

### 2. Whether the ALJ appropriately rejected evidence regarding absenteeism and inability to work an eight-hour day.

Plaintiff next argues that the ALJ erred in rejecting the opinions of several physicians regarding Plaintiff's potential absenteeism and inability to work throughout an 8-hour day on a regular basis.  The ALJ determined that the opinions of Dr. Frazin, Dr. LaBree, Dr. Bhat, and Dr. Ohagwu regarding Plaintiff's

24

excessive absenteeism and inability to perform work activities throughout an eight-hour work day were entitled to *no weight*. (Tr. 942.)  The ALJ's reasons for rejecting these medical opinions entirely include the following: (1) Plaintiff was able to work in the past despite her lupus and fibromyalgia; (2) Plaintiff's receipt of benefits from the VA may have provided a disincentive to work; (3) some consultants opined that Plaintiff could work at a light level on a full-time basis; and (4) Plaintiff appeared alert and oriented during many of her visits with physicians.  (Tr. 942-43.)

Dr. Bhat, in her assessment of Plaintiff's ability to do work-related activities, concluded that Plaintiff could be expected to miss more than four days of work each month.  (Tr. 427.)  Dr. LaBree, in his testimony as a medical expert at Plaintiff's first hearing, agreed that Plaintiff's chronic pain would "interfere with her ability to be at work five days a week, eight hours a day and sustained work activities."  (Tr. 1047.)  Dr. Frazin, in his testimony as a medical expert at Plaintiff's second hearing, agreed that Plaintiff would have difficulty maintaining attendance at work and would be absent at least twice each month.  (Tr. 2059.) Dr. Ohagwu also appears to have concluded that Plaintiff would have difficulty sustaining work for a full eight-hour day.  (Tr. 274 (noting that "[i]f [Plaintiff's] duties are structured to allow enough sitting time and limit lifting as well as very repetitive use of her extremities she can still function for several hours in a usual 8-hour work shift").)

The ALJ erred in giving these opinions no weight.  First, there is consistent medical evidence to support the opinions regarding Plaintiff's absenteeism.  Dr. Frazin indicated that Plaintiff's impairments included lupus, fibromyalgia, and chronic pain syndrome.  (Tr. 2040.)  Such responses are consistent with the diagnoses provided by Dr. Bhat and the testimony of Dr. LaBree in support of their opinions regarding Plaintiff's likely absenteeism and the difficulty she would have working an eight-hour day on a regular basis.  Similarly, Dr. Ohagwu's conclusion that Plaintiff could only function for several hours in a usual eight-hour work day if she were allowed enough sitting time, limited lifting, and no repetitive use of the extremities is consistent with Dr. Bhat's opinion that Plaintiff would require unscheduled breaks from work during such a work day.  These opinions are inconsistent with an ability to engage in competitive, full-time employment. *See Ross v. Apfel*, 218 F.3d 844, 849 (8th Cir. 2000) (noting that an RFC finding assesses a claimant's ability to perform sustained work-related physical activities for eight hours a day, five days a week, or the equivalent work schedule).

Second, the ALJ's discussion of Plaintiff's alternative source for benefits does not support rejecting these opinions.  While an ALJ may consider the disincentive to work that may exist if a claimant receives benefits from another source, *see Eichelberger v. Barnhart*, 390 F.3d 584, 590 (8th Cir. 2004), here, the ALJ incorrectly concluded that Plaintiff was able to work until she received VA benefits.  The decision to award Plaintiff VA benefits was not rendered until October 2002 (Tr. 493), and Plaintiff's disability onset date is March 2001.

26

(Tr. 144.)  Also, any disincentive to work on the Plaintiff's bears only upon her own credibility and does not call into question the accuracy of the multiple corroborating diagnoses of Plaintiff's impairments.

Third, the fact that Plaintiff appeared alert and oriented at some of her appointments with her treating and examining physicians is not a good reason to reject the conclusions about her absenteeism and difficulty performing work-related tasks throughout an eight-hour work day.  The conclusions about Plaintiff's absenteeism and ability to persist at work were not based on Plaintiff's lack of attentiveness, but on her physical diagnoses and chronic pain.  (*See* Tr. 91, 274, 2043, 2059.)  The ALJ further erred in rejecting the opinions of all of these doctors regarding her absenteeism and inability to fulfill an eight-hour work day on the grounds that "[Plaintiff's] husband works, and [she] provides some childcare and other household tasks which would require sustained attention and concentration."  (Tr. 942.)  The fact that Plaintiff's husband works is completely irrelevant to the support for the physicians' conclusions about Plaintiff's absenteeism and difficulty with working.  Similarly, the ALJ's discussion about Plaintiff's attention and concentration in performing childcare and household tasks does not establish an inconsistency in the objective medical evidence sufficient to reject the opinions of Plaintiff's treating and examining physicians. *See Reed v. Barnhart*, 399 F.3d 917, 924 (8th Cir. 2005) ("Since a claimant need not prove she is bedridden or completely helpless to be found disabled, . . . the import of [the claimant's] ability to carry out daily activities must be assessed in

the light of the record-supported limitations on her ability to perform real-world work.") (internal quotations and citation omitted).

The ALJ should have given substantial weight to the doctors' opinions about Plaintiff's absenteeism and ability to work an eight-hour day, rather than rejecting them outright.

This Court finds that it is unnecessary to consider Plaintiff's remaining arguments.[1]  The VE at the second hearing testified that it was generally not an acceptable degree of absenteeism for a person to miss two days of work each month.  (Tr. 2059).  The VE also testified that calling in sick or being unable to complete an eight-hour work day more than two days per month would preclude competitive employment.  (Tr. 2062-64.)  Finally, he testified that the need to take unscheduled breaks three times a day would preclude competitive employment. (Tr. 2065.)  Based on this testimony, Dr. Bhat's opinion about the restrictions necessary for Plaintiff to engage in work activities, the testimony of Dr. Frazin and Dr. LaBree regarding Plaintiff's excessive absenteeism, and Dr. Ohagwu's opinion regarding her inability to work eight hours each day on regular basis, there is overwhelming evidence to support a finding of disability.  *See Ross*, 218 F.3d at 850 (finding that the only RFC supported by the record was that the

---

[1]      For instance, Plaintiff has argued that the ALJ committed error in determining that certain impairments were non-severe, that the ALJ erred in assessing Plaintiff's credibility, that the ALJ erred in his consideration of the fact that the VA determined Plaintiff was 100% disabled, and that her mental impairments were not adequately addressed by the RFC determination made by the ALJ.

claimant could not maintain attendance required for full-time competitive employment, and remanding for a calculation and award of benefits.)  Therefore, this Court recommends that this case be remanded for a calculation and award of benefits.

## IV.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1.    Plaintiff's Motion for Summary Judgment (Doc. No. 14) be **GRANTED**;

2.    Defendant's Motion for Summary Judgment (Doc. No. 16) be **DENIED**; and

3.    This case be remanded to the Commissioner for a calculation and award of benefits.


Date: March 11, 2009

                                                *s/ Jeffrey J. Keyes*
                                                JEFFREY J. KEYES
                                                United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by March 25, 2009, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.